Filed 9/15/16  In re D.S. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re D.S., a Person Coming Under the Juvenile Court Law. | B268002 |
| | (Los Angeles County Super. Ct. No. DK09801) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. J.S., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Terry T. Truong, Juvenile Court Referee.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Respondent.

After the juvenile court removed D.S. from his father's custody and approved placement with a family friend, D.S.'s mother, who had not seen or had custody of the boy in at least five years, asked the court to place him with her in Oregon. The court declined, finding it would be detrimental to send D.S. to Oregon because, among other things, he suffered from emotional and behavioral problems stemming from an already unstable home environment and his mother had made no attempt to contact D.S. or ascertain his needs after she learned he was detained. We consider whether substantial evidence supports the court's placement order.

## I. BACKGROUND

### A

On March 5, 2015, the Los Angeles County Department of Children and Family Services (the Department) petitioned to declare then seven-year-old D.S. a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivision (b)(1) (failure to protect).[1] The Department alleged D.S.'s father, A.S. (Father), was a current abuser of marijuana and methamphetamine, which prevented him from being able to adequately protect D.S. and provide regular care for the child. Father and D.S. generally lived with Father's mother (Grandmother), but she frequently expelled them from her home. On those occasions, Father would convince a neighbor or friend to take in D.S. temporarily, or the two of them would sleep in the communal laundry room of an apartment complex. Father used illegal drugs, was not regularly employed, and suffered from depression or other emotional disorders.

At an initial hearing on the section 300 petition, the juvenile court detained D.S. and removed him from Father's physical custody. The Department initially placed him in

---

[1] Undesignated statutory references that follow are to the Welfare and Institutions Code.

2

foster care, but later moved him to the home of a family friend who lived directly behind Grandmother and had cared for D.S. in the past when he had no place to stay.[2]

D.S. was very attached to Father and grew anxious and worried whenever they were separated. He would forgo finishing his meals in order to save food and give it to Father, cried when the Department detained him, and stated he wanted to live with Father. After the court removed D.S. from Father's custody, he exhibited an array of problems including increased bedwetting, fighting, and throwing temper tantrums, as well as poor performance at school.

Father had no contact with D.S.'s mother, J.S. (Mother), whom the Department eventually located in Oregon.[3] According to Father, Mother left him and D.S. when D.S. was eight months old; Mother, on the other hand, said Father "kidnapped" D.S. from her when D.S. was two.[4] Mother told the Department she and Father had separated earlier because Father abused drugs, was in and out of prison, and was physically aggressive toward her.

When the Department made contact with Mother, she informed the social worker she wanted custody of D.S. In Oregon, she lived in a three-bedroom house with five other children (two older and three younger than D.S.) and her husband, A.M., to whom she had been married for less than a year. Mother attended school and was not employed. A.M., who worked as a cook and a cameraman, had three other children who did not live

---

[2]     The Department advised against placing D.S. with Grandmother—who agreed with that recommendation—because she did not desire to care for D.S. and had an extensive history with the juvenile court system including an existing case involving other minors currently living in her home.

[3]     The Department reached Mother by phone on March 4, 2015, the day before the detention hearing. Mother said she would try to attend the hearing but that she was caring for five children in Oregon.

[4]     Mother learned Father was in Los Angeles and attempted to contact him but did not file a missing person's report on D.S. or otherwise seek assistance from the authorities to secure his return.

3

with them. According to Mother, A.M. had a criminal record for domestic violence but had completed his probation.

Over approximately six weeks, the Department attempted to initiate a home visit for Mother, arrange for background checks of her and A.M., and confirm A.M. had complied with court orders following his conviction. Mother did not respond to the Department's phone calls and did not provide proof A.M. had satisfied his probation conditions. Mother also did not contact the Department of her own accord to arrange for any visits or phone calls with D.S.

In a report prepared after interviewing Mother in late April 2015, the Department recommended against placing D.S. with her. The Department reasoned that D.S.'s unstable home environment, his "current mental health issues and anxiety related to his separation from [Father]," his lack of contact with Mother since age two, and her "lack of efforts . . . to visit or contact [D.S.] by phone since the time of this current detention" were all factors that would make it emotionally detrimental to again remove D.S. and place him with Mother in Oregon. The Department asked the juvenile court to keep D.S. in his current placement with the family friend, which would "facilitate increased contact with [Father]," and to order family reunification services for both Mother and Father.

The record indicates that the Department had no further contact with Mother after this interview, despite making multiple attempts to reach her. Mother never responded to messages left by Department personnel, nor did she initiate any contact with the Department on her own.

B

At a jurisdictional hearing on April 28, 2015, the juvenile court sustained the substance abuse allegations against Father. The court held a dispositional hearing on June 8, 2015.

At the dispositional hearing, Mother's counsel asked for a continuance because she had been unable to contact Mother, whose phone number was apparently not working and who had not responded to a recent letter. The court agreed to continue the hearing as

to Mother. With respect to Father, who was represented by counsel at the hearing but did not personally appear, the court removed D.S. from his custody and ordered reunification services and monitored visits.[5]

Mother attempted to call into the continued disposition hearing on June 24, 2015, but because of apparent miscommunication with the court clerk, she was unable to participate personally. At the hearing, Mother's counsel asserted Mother wanted custody of D.S. and contended placing him with her would not cause the child detriment. D.S.'s attorney opposed placing him with Mother, explaining D.S. desired to live with Father and had not lived with Mother for years, Mother lived out of state, and Mother had not been responsive to the Department's efforts to communicate with her. D.S.'s attorney asked that the child remain placed with the family friend, with whom he was close and under whose care he was "beginning to have some sense of normalcy" after initially struggling with his removal from Father. The Department concurred with D.S.'s lawyer, emphasizing that D.S.'s bedwetting, lackluster school performance, and emotional issues appeared related to his separation from Father and that placing him with Mother would exacerbate those problems.

Mother's attorney argued, in response, that Mother had a fundamental constitutional right to care for D.S. and that Mother's lack of connection with D.S. was not attributable to her but instead to Father. Counsel argued Mother was willing to do everything necessary to care for D.S. and that in her home he would have the opportunity to connect not only with Mother but also with his half-siblings.

Mother's attorney sought to admit into evidence, over the Department's objection, an e-mail Mother sent 12 days earlier, in which Mother gave her account of the circumstances in which she claimed Father took D.S.[6] In the e-mail, Mother said she

---

[5]     In the months following D.S.'s initial detention, Father called and visited the child with decreasing frequency. He also ultimately ceased contact with the Department.

[6]     The juvenile court marked the e-mail for identification but did not admit it into evidence.

attempted to track Father down through social media but he either blocked her or disconnected his accounts so she could not reach him. She said law enforcement told her she had no legal recourse to get D.S. back because Father was on D.S.'s birth certificate and D.S. had his last name. She said she considered hiring a private investigator but could not afford to do so.

Applying the relevant legal standard under section 361.2, the court found by clear and convincing evidence that placing D.S. with Mother "would be detrimental to [D.S.'s] safety, protection, or physical or emotional well-being." The court stated Mother's actions and arguments reflected her own personal desires without manifesting any concern for D.S.'s needs. Specifically, the court noted Mother failed to follow up on the Department's attempts to communicate with her, and there was no indication she had "take[n] into consideration the issues that [D.S. was] suffering from, and his feelings in this case, and how he [was] behaving, and why he [was] behaving the way he [was]." Mother's actions, in the court's view, suggested she did not have D.S.'s "best interest at heart" and that "all she wants is custody without fully realizing the situation that [D.S.] has found himself to be in." Given D.S.'s emotional and behavioral issues and the lack of an established relationship between him and Mother, the court concluded it would be detrimental to place him with Mother in another state. The court kept D.S.'s current placement order in effect and ordered reunification services for Mother, as well as monitored contact between her and D.S.

After the disposition hearing, Mother moved the juvenile court to reconsider its orders and findings because she had been unable to participate in the hearing telephonically despite making efforts to do so. The court granted Mother's motion and accordingly scheduled a new dispositional hearing for September 10, 2015.

Mother, however, did not participate in the rescheduled hearing, and offered no explanation why, even though her attorney sent her several e-mail and voicemail messages about the proceeding and included the court number to call. At the rescheduled hearing, Mother's counsel again sought to admit Mother's June e-mail to her, and this time the court ruled it would receive the email in evidence. Counsel for the parties then

6

presented essentially the same arguments they had made at the June hearing, and the court reached the same conclusion it had earlier, namely, that D.S. should remain a dependent of the court and that his placement with Mother would be detrimental to his "safety, protection, or physical or emotional well-being." The court stated that it "previously felt, and . . . still feel[s], that [Mother] just does not get it. She does not understand that [D.S.] has issues. And all I can see her focused on is her having custody of [D.S.] That's all fine and good, and a parent should have custody of their child. However, she is not taking into consideration [D.S.'s] needs and the best interest for [D.S.] because, if she did, she would see that placing him with her at this time would do him much, much worse than it would help him. And I'm not in a position, and I will not make the order, to place him out of state with a parent whom he has not seen in at least five years." The court again ordered reunification services for Mother and monitored contact between her and D.S.


## II.  DISCUSSION

Mother contends there was insufficient evidence for the juvenile court to find that placing D.S. with her would cause him detriment because Mother was never made aware of D.S.'s problems, his problems were unrelated to her own conduct, and there was no evidence she would not address them—to the extent they even persisted—once D.S. joined her in Oregon. She further contends that the court's finding of detriment was infirm because it was not based on the opinion of a qualified psychological practitioner. In her view, D.S.'s desire to remain with Father, his lack of a relationship with Mother, his bond with his current caregiver, and Mother's residence in another state are insufficient to establish detriment.

We hold there was sufficient evidence for the juvenile court to conclude that placing D.S. with Mother would be detrimental to, at minimum, his emotional well-being. Because D.S.'s existing emotional and behavioral problems were connected to his unstable home environment and separation from Father, the juvenile court could reasonably find that placing him with Mother in Oregon would make those problems

7

worse.  Such a finding is reinforced by evidence that Mother never attempted to reestablish contact with D.S., despite claiming to want custody after not seeing him in more than five years, and made no efforts to respond to the Department's requests or to assuage the court's concerns regarding her fitness to provide a supportive environment.

A

California's dependency scheme is premised on the understanding that it is in a child's best interests to live with a parent absent detriment to the child.  (See, e.g., *In re Liam L.* (2015) 240 Cal.App.4th 1068, 1085 (*Liam L.*); see also *In re A.A.* (2012) 203 Cal.App.4th 597, 605 (*A.A.*) [nonoffending parent has constitutional and statutory rights to physical custody of child absent evidence of detriment].)  Section 361.2, the statutory provision that reflects this understanding, provides as follows:  "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

The juvenile court must find detriment by clear and convincing evidence (see, e.g., *In re Abram L.* (2013) 219 Cal.App.4th 452, 461), which is "evidence . . . so clear as to leave no substantial doubt" (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426 (*Luke M.*), citation omitted).  The clear and convincing standard, however, "is for the edification and guidance of the trial court and [is] not a standard for appellate review."  (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880 (*Sheila S.*), citing *Crail v. Blakely* (1973) 8 Cal.3d 744, 750.)  "Thus, on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.'  (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 365, p. 415.)"  (*Sheila S.*, *supra*, at p. 881.)

8

Accordingly, we review the juvenile court's decision to place D.S. with the family friend rather than Mother for substantial evidence. (See, e.g., *In re C.M.* (2014) 232 Cal.App.4th 1394, 1402 (*C.M.*).) Because we do not reweigh or resolve conflicts in the evidence, it is irrelevant whether we would come to a different conclusion than the juvenile court in the first instance. (See, e.g., *In re E.B.* (2010) 184 Cal.App.4th 568, 578.)

B

Here, there is ample evidence supporting the juvenile court's finding that placing D.S with Mother would be detrimental to his well-being. Once a noncustodial parent asks the juvenile court to place a dependent child with him or her, the court may consider "any factor that would cause [the child] detriment," including the likelihood of emotional harm and issues unrelated to the noncustodial parent's conduct. (*Luke M.*, *supra*, 107 Cal.App.4th at pp. 1423, 1425-1426.) Although Mother correctly observes D.S.'s desire to remain with Father, Mother's residence out of state, and the lack of contact between her and D.S. do not by themselves definitively establish detriment (see, e.g., *C.M.*, *supra*, 232 Cal.App.4th at p. 1394; *In re K.B.* (2015) 239 Cal.App.4th 972 (*K.B.*), the juvenile court in this case did not find detriment for these reasons alone. Its principal concern was that D.S. was suffering from behavioral and emotional problems, arising at least in part from his unstable home environment—problems that Mother made no effort to comprehend or show any indication of addressing.

Mother's argument that she was unaware of D.S.'s issues because the Department never informed her of them rings hollow given that she did not respond to the Department's attempts to contact her. In addition, in the six-month period between early March, when the Department initially contacted Mother and informed her D.S. was detained, and mid-September, when the court held D.S.'s dispositional hearing as to Mother, she did not contact D.S. or attempt to ascertain his situation through the Department. Assuming Mother's counsel informed her of the outcome of the June hearing, Mother squandered the opportunity between then and September to establish

9

contact with D.S. and try to respond to the issues raised by the court.[7] (Compare *K.B.*, *supra*, 239 Cal.App.4th at pp. 975-977 [affirming placement with noncustodial, out-of-state father who called child twice weekly, recommended measures to help him transition to father's home, and provided evidence he could secure counseling for the child]; *Liam L.*, *supra*, 240 Cal.App.4th at pp. 1075-1077 [affirming placement with noncustodial, out-of-state father who received home evaluation, completed foster parent courses, spoke with children by phone, visited children in California, and had them visit him in Kansas].)

Mother's behavior, in other respects, also supports the court's finding of detriment. She did not respond to the Department's attempt to set up a home visit or to conduct background checks of her and her spouse. Mother's husband has a prior conviction for domestic violence, and Mother failed to provide proof he complied with his probation conditions. While Mother had an excuse for failing to participate in the June hearing, she offered no explanation for why she did not attend or call into the September hearing—which she requested through filing a motion for reconsideration. The totality of Mother's conduct supports a reasonable inference that she lacked a sincere commitment to providing a supportive environment for D.S. and that placing D.S. in her home would cause him detriment.

That the juvenile court reached its conclusion without relying on the opinion of a psychiatrist, psychologist, or therapist does not undermine its decision. The court was not required to base its findings on the opinion of a qualified expert, and the evidence of detriment in this case was fully comprehensible to the court without the need for interpretation of an outside expert. D.S. was manifesting behavioral and emotional issues associated with his unstable home environment and separation from Father, and Mother made no efforts to reestablish a connection with D.S., to learn of his difficulties, or to show how she would address them. Furthermore, the court was entitled to credit the

_____

[7]     At the June hearing, the court authorized monitored visitation between Mother and D.S., which included weekly phone calls and could be liberalized at the Department's discretion.

10

opinions of Department social workers, who had direct contact with the relevant parties in this case as well as experience in determining the risks associated with placing dependent children. (See *Luke M.*, *supra,* 107 Cal.App.4th at p. 1427 ["Social workers are frequently recognized as experts in assessing risk and placement of children and selecting permanent plans for children"].) Under the circumstances, the court had a proper basis to believe D.S.'s behavioral and emotional problems would only intensify if he were placed with Mother.[8]

Mother's reliance on *In re John M.* (2006) 141 Cal.App.4th 1564 (*John M.*) and *In re Patrick S. III* (2013) 218 Cal.App.4th 1254 (*Patrick S.*) does not undermine our conclusion. The reviewing court in *John M.* held the juvenile court erred when it found that a child's placement with his noncustodial, out-of-state father would cause the boy detriment because of the boy's preference to live with an aunt, lack of contact between the child and his father, and the boy's need for services. (*John M.*, *supra*, at p. 1568.) Any similarities between *John M.* and this case are outweighed by the salient differences. Unlike this case, (1) the father in *John M.* reestablished a relationship with his son one year prior to the dependency proceedings, (2) the father had no criminal history, and (3) there was no evidence the father was unable to provide for his son's needed services, which were unrelated to the boy's placement with the father. (*Id.* at pp. 1568, 1570-1571.) The court's decision in *John M.* was also driven by the fact that the social services agency overseeing the minor had been lax in investigating the father as a potential placement. (*Id.* at pp. 1568, 1572-1573.) Here, on the other hand, D.S.'s behavioral and emotional issues were connected to his unstable, transient living environment. The record also reflects the Department went to great lengths to contact Mother, to attempt to involve her in D.S.'s life, and to determine whether she might be a

---

[8]    There was evidence that D.S.'s emotional issues, such as bedwetting, gradually improved after he was placed in a stable environment. To the extent D.S.'s problems were less severe by the time of the hearing, the juvenile court could reasonably attribute that improvement to the child's placement with a familiar caregiver in familiar surroundings, which would not be the case if he were sent to live with Mother.

11

suitable placement option—efforts that were in vain because of Mother's failure to respond. Notwithstanding the result in *John M.*, the juvenile court in this case had a strong basis on which to conclude destabilizing D.S.'s home life once again, without any confidence that Mother could or would address such instability, would be detrimental to his well-being.

*Patrick S.* is also inapposite. The juvenile court in *Patrick S.* denied the noncustodial father's request to place his son in the father's out-of-state home based on the boy's anxiety about moving in with his father; his desire not to be homeschooled (which the father intended to do); the lack of a longstanding relationship between the child, father, and stepmother; the father's scheduled military deployments; and the child's need for services. (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1262.) The Court of Appeal held those factors did not constitute substantial evidence of detriment because the record overall "le[ft] no doubt that [the father was] a competent, caring and stable parent." (*Id.* at p. 1263.) Rather than supporting Mother's contentions, the *Patrick S.* court's account of what made the father a fit parent only highlights the ways in which the evidence in this case supports the juvenile court's contrary finding regarding Mother. (*Ibid.* ["[The father] is very concerned about [his son's] welfare. He paid child support every month for 11 years without knowing where his son was. He searched for him for years. When he learned of his son's whereabouts, [the father] immediately came forward and requested placement, attended all significant hearings in the dependency proceedings, visited and contacted his son whenever possible, looked into obtaining recommended services for [the son] and his family through the Navy and his church, and participated in recommended services"].) Mother's failure in this case to maintain contact with D.S., to work with the Department, and to participate in the dependency proceedings was substantial evidence that she would not or could not address D.S.'s needs were he to be removed from a placement that seemed to be addressing his issues and sent to live with her in Oregon.

Although we accordingly uphold the juvenile court's dispositional order on the record before us, we recognize the juvenile court ordered reunification services, with

contact to occur between D.S. and Mother. If Mother participates in these services, begins to re-establish contact with D.S., and demonstrates greater responsiveness than she did at the time of the dispositional hearing, the juvenile court will of course be entitled to take that into account in fashioning future orders.

## DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

TURNER, P.J.

KRIEGLER, J.